USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ______
DATE FILED: 2/28/17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

AMERICAN TRUCKING ASSOCIATIONS, INC., WADHAMS ENTERPRISES, INC., LIGHTNING EXPRESS DELIVERY SERVICE INC., and WARD TRANSPORT & LOGISTICS CORP.,

Plaintiffs,

-against-

No. 13 Civ. 8123 (CM)

NEW YORK STATE THRUWAY AUTHORITY, NEW YORK STATE CANAL CORP., THOMAS J. MADISON, JR., HOWARD MILSTEIN, DONNA J. LUH, E. VIRGIL CONWAY, RICHARD N. SIMBERG, BRANDON R. SALL, J. RICE DONALD, JR., and JOSE HOLGUIN-VERAS

Defendants.

---------------------------------------------------------------x

**DECISION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**

McMahon, C.J.:

In the early years of *Saturday Night Live*, the late, great Gilda Radner portrayed a character named Emily Litella. Ms. Litella was a concerned citizen who happened to be hard of hearing. Week after week, Ms. Litella showed up on the Weekend Update segment of the show to complain about some outrageous thing she had heard on the news. And week after week, the exasperated anchorman explained to Ms. Litella that she had misunderstood – the news story about parents objecting to "violins" on television was really about the "violence" on television; the one about "busting" school children was really about "busing" children. Once corrected, both Ms. Litella's ire and her person deflated visibly, until, looking directly into the camera, she uttered an apology for having wasted everyone's time.

She said, "Never mind."

We have reached the Emily Litella moment in this action.

Three and one half years ago, Plaintiffs sued the New York State Thruway Authority. They alleged that the use of Thruway toll receipts collected from interstate truckers to fund the facilities and activities of the New York State Canal Corporation violated the so-called "Dormant

Commerce Clause" of the United States Constitution. There is no such clause in the Constitution; rather, the Dormant Commerce Clause doctrine is a judge-made construct that prevents states from fobbing off costs that should be paid by resident taxpayers onto non-residents in a manner that discriminates against interstate commerce. In case after case, the Supreme Court, the Second Circuit, and other courts have struck arrangements that violated the Dormant Commerce Clause because funds paid by out-of-staters for one purpose (say, maintaining the New York State Thruway, on which Plaintiffs drive) were used for a different purpose, one that the payors do not use (in this case, the restoration and upkeep of the historic barge canals in Upstate New York, and their preservation for limited transportation and unlimited educational and recreational purposes). Plaintiffs sought an injunction against the use of excess Thruway tolls to fund the Canal System – a practice that had been going on for over two decades by the time this lawsuit was filed – as well as a refund of tolls paid over the three years immediately prior to the commencement of this action.

The case was intensively litigated from the beginning. The Thruway Authority, represented by the Attorney General, initially moved to dismiss the complaint on the ground that New York State – whose fisc would have to be raided to pay any damages, and whose plans for the Canal Corporation were imperiled – was a necessary party. This Court agreed. (*See* Dkt. No. 28.) The Second Circuit did not, at least, in part, on the ground that the Attorney General could be counted on to protect the State's interest – and the public fisc – while representing the Thruway Authority. *See Am. Trucking Ass'n, Inc. v. N.Y. State Thruway Auth.*, 795 F.3d 351, 360, 361 (2d Cir. 2015).[1]

After extensive discovery, the parties cross-moved for summary judgment on the issue of liability. (*See* Dkt. Nos. 33, 47.) The Attorney General argued vociferously that Plaintiffs' Dormant Commerce Clause claim was time-barred and that the Thruway tolls did not discriminate against interstate commerce. Nonetheless, in a lengthy opinion, this Court concluded that the Thruway Authority's practice of funding the maintenance and operations of the Canal Corporation with Thruway tolls violated the Dormant Commerce Clause. (*See* Dkt. No. 68 at 14, 25-45.) The Court ordered immediate injunctive relief.

Only days after this opinion was released, the Court happened to see a story about it in a local newspaper. The reporter revealed that the injunction was unlikely to have much effect, because the State Legislature had recently transferred control of the Canal Authority and Corporation from the Thruway Authority to the New York State Power Authority, a non-party to this action. Neither the Attorney General nor counsel for Plaintiffs was aware of this change. (*See* Dkt. Nos. 69, 70, 71, 72.)

The journalist's revelation ended Plaintiffs' quest for injunctive relief. But we were not through. A claim for damages had been asserted on behalf of the class of interstate truckers. In light of the Court's ruling on the merits, that claim was viable for the period beginning November 14, 2010 (three years prior to the day the lawsuit was filed) and ending on April 1, 2016 (the day the Thruway Authority turned responsibility for the Canal Authority and Corporation over to the Power Authority). The parties were ordered to take damages discovery

[1] The Thruway Authority is not "the State" for purposes of carrying out its business activities. *Mancuso v. N.Y. State Thruway Auth.*, 86 F.3d 289, 296 (2d Cir. 1996).

and move for class certification. They did so. (*See* Dkt. No. 74.) The Court was beginning to work on the class certification motion, when . . .

Out of the blue, the Thruway Authority moved to dismiss the complaint – arguing, for the first time, that the Court lacked jurisdiction and that the complaint failed to state a cognizable claim for relief.

It is necessary to take a trip back in time in order to understand the motion.

The principal proponents of the plan for the Thruway Authority to assume responsibility for the canals were two public servants of no mean intellect – Daniel Patrick Moynihan, United States Senator, Harvard professor, Upstate resident, and champion of historical restoration; and Mario Cuomo, the intellectual Governor of the State of New York and a noted lawyer in his own right. These clever and knowledgeable men came up with a scheme by which the decrepit canals and their environs could be restored to their former glory – thereby shoring up the depressed economy of Upstate New York – all without bothering the State's already overburdened taxpayers.

But while they were hatching their plan to use excess Thruway toll revenues to repair and maintain the canals and their environs, it apparently occurred to them, or to the people who were advising them, that the arrangement they proposed might run afoul of the Dormant Commerce Clause.

Happily, there was a solution. Congress, exercising its undoubted power to regulate commerce, is free to exempt programs that would otherwise violate the Dormant Commerce Clause from its ambit. "Congress, unlike a state legislature authorizing similar expenditures, is not limited by any negative implications of the Commerce Clause in the exercise of its spending power. Where state or local government action is specifically authorized by Congress, it is not subject to the Commerce Clause *even* if it interferes with interstate commerce. Thus, if the restrictions imposed . . . are directed by Congress then no dormant Commerce Clause issue is presented." *White v. Mass. Council of Constr. Emp'rs, Inc.*, 460 U.S. 204, 213 (1983) (emphasis added). "Once Congress acts, courts are not free to review state taxes or other regulations under the dormant Commerce Clause. When Congress has struck the balance it deems appropriate, the courts are no longer needed to prevent States from burdening commerce, and it matters not that the courts would invalidate the state tax or regulation under the Commerce Clause in the absence of congressional action. Courts are final arbiters under the Commerce Clause only when Congress has not acted." *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 154-55 (1982).

The only limitation is that Congress must be clear about its intentions. "Congress must manifest its unambiguous intent before a federal statute will be read to permit or to approve such a violation of the Commerce Clause." *Wyoming v. Oklahoma*, 502 U.S. 437, 458 (1992). "Congress' 'intent and policy' to sustain state legislation from attack under the Commerce Clause [must be] 'expressly stated.'" *Sporhase v. Nebraska*, 458 U.S. 941, 960 (1982). That said, "There is no talismanic significance to the phrase 'expressly stated,' however; it merely states one way of meeting the requirement that for a state regulation to be removed from the

reach of the dormant Commerce Clause, congressional intent must be unmistakably clear." *South-Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 91 (1984).

So Senator Moynihan, a master of the legislative process, inserted an amendment into a pending bill called the Intermodal Surface Transportation Efficiency Act of 1991 ("ISTEA"). The bill's stated purpose was, "To develop a national intermodal surface transportation system, to authorize funds for construction of highways, for highway safety programs, and for mass transit programs, *and for other purposes*." ISTEA, Pub. L. No. 102-240, § 2, 105 Stat. 1914 (1991) (emphasis added). Senator Moynihan's insertion addressed one of those "other" purposes. It authorized the New York State Thruway Authority to provide financial assistance for the Canal System.

How, exactly?

ISTEA specifically provides that the New York State Thruway Authority[2] (identified by name) is authorized to use toll revenues for "any transportation project eligible for assistance under title 23" or for the "costs associated with transportation facilities" under its jurisdiction. Specifically, ISTEA § 1012(e) as originally enacted said:

> Notwithstanding sections 119 and 129 of title 23, United States Code, at the request of the non-Federal parties to a toll facility agreement reached before October 1, 1991, regarding the *New York State Thruway* or the Fort McHenry Tunnel under section 105 of the Federal-Aid Highway Act of 1978 or section 129 of title 23, United States Code (as in effect on the date before the date of the enactment of this Act), the Secretary shall allow for the continuance of tolls without repayment of Federal funds. *Revenues collected from such tolls*, after the date of such request, in *excess of revenues needed for debt service and the actual costs of operation and maintenance* shall be available for (1) *any transportation project* eligible for assistance under title 23, United States Code, or (2) *costs associated with transportation facilities* under the jurisdiction of such non-Federal party, including debt service and costs related to the construction, reconstruction, restoration, repair, operation and maintenance of such facilities.

(Emphasis added). A different section of ISTEA, § 1007(c), lists projects relating to surface transportation that were eligible for federal assistance under title 23 – and, hence, that could be funded by the Thruway Authority using excess toll revenues. One item on that list, "Transportation enhancement activities," was defined as follows:

> The term 'transportation enhancement activities' means, with respect to any project or the area to be served by the project, provision of facilities for pedestrians and bicycles, acquisition of scenic easements and scenic or historic sites, scenic or historic highway programs, landscaping and other scenic beautification, historic preservation, rehabilitation and operation of historic transportation buildings, structures, or *facilities*

[2] And the Fort McHenry Toll Bridge in Baltimore; some Senator from Maryland apparently had Dormant Commerce Clause concerns as well.

(including historic railroad facilities and *canals*), preservation of abandoned railway corridors (including the conversion and use thereof for pedestrian or bicycle trails), control and removal of outdoor advertising, archaeological planning and research, and mitigation of water pollution due to highway runoff.

(Emphasis added). It would be hard to come up with a better or more comprehensive description of the New York State Canal System project in its entirety than ISTEA's definition of "transportation enhancement activities."

Larded with Senator Moynihan's critically important member item, ISTEA became a law on December 18, 1991. Shortly thereafter, on August 3, 1992, the canals were officially transferred to the jurisdiction of the Thruway Authority. And thereafter, in perfect accord with Congress' unmistakable intent, millions of dollars in toll money that were not needed to maintain, repair, and provision the New York State Thruway were diverted to create the "transportation enhancement activity" that has become the "crown jewel" of Upstate New York: The canals and their historic buildings and facilities were restored to their nineteenth century glory; there was much landscaping, historic preservation, and scenic beautification. No detail was overlooked; there were even pedestrian and bike trails, all as expressly provided for by ISTEA. (*See* Dkt. No. 68 at 10, 37, 45.)

Over time, ISTEA was amended; but none of the amendments eliminated the statutory authorization allowing the Thruway Authority to spend excess toll revenues (i.e., toll revenues not needed for Thruway maintenance) on the canals.

For example, in 2005, the definition of "transportation enhancement activities" was recodified at 23 U.S.C. § 101(a)(35)(G). *See* Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users ("SAFETEA-LU"), Pub. L. No. 105-59, § 1122, 119 Stat. 1144, 1196 (2005). It was substantively unchanged from the original definition of the term in ISTEA.[3]

In 2012, Congress replaced the term "transportation enhancement activities" with "Transportation Alternatives." *See* Moving Ahead for Progress in the 21st Century Act ("MAP-

---

[3] "The term 'transportation enhancement activity' means, with respect to any project or the area to be served by the project, any of the following activities as the activities relate to surface transportation:"

> (A) Provision of facilities for pedestrians and bicycles. (B) Provision of safety and educational activities for pedestrians and bicyclists. (C) Acquisition of scenic easements and scenic or historic sites (including historic battlefields). (D) Scenic or historic highway programs (including the provision of tourist and welcome center facilities). (E) Landscaping and other scenic beautification. (F) Historic preservation. (G) *Rehabilitation and operation of historic transportation buildings, structures, or facilities (including historic railroad facilities and canals).* (H) Preservation of abandoned railway corridors (including the conversion and use of the corridors for pedestrian or bicycle trails). (I) Inventory, control, and removal of outdoor advertising. (J) Archaeological planning and research. (K) Environmental mitigation (i) to address water pollution due to highway runoff; or (ii) reduce vehicle-caused wildlife mortality while maintaining habitat connectivity. (L) Establishment of transportation museums.

*Id.* (emphasis added).

21"), Pub. L. No. 112-131, § 1103, 126 Stat. 405, 419-21 (2012). It was a change in name only: "The term 'transportation alternatives' means any of the following activities when carried out as part of any program or project authorized or funded under this title, or as an independent program or project related to surface transportation:"

> (A) Construction, planning, and design of on-road and off-road trail facilities for pedestrians, bicyclists, and other nonmotorized forms of transportation, including sidewalks, bicycle infrastructure, pedestrian and bicycle signals, traffic calming techniques, lighting and other safety-related infrastructure, and transportation projects to achieve compliance with the Americans with Disabilities Act of 1990 (42 U.S.C. 12101 et seq.). (B) Construction, planning, and design of infrastructure-related projects and systems that will provide safe routes for non-drivers, including children, older adults, and individuals with disabilities to access daily needs. (C) Conversion and use of abandoned railroad corridors for trails for pedestrians, bicyclists, or other non-motorized transportation users. (D) Construction of turnouts, overlooks, and viewing areas. (E) Community improvement activities, including (i) inventory, control, or removal of outdoor advertising; (ii) *historic preservation and rehabilitation of historic transportation facilities*; (iii) vegetation management practices in transportation rights-of-way to improve roadway safety, prevent against invasive species, and provide erosion control; and (iv) archaeological activities relating to impacts from implementation of a transportation project eligible under this title. (F) Any environmental mitigation activity, including pollution prevention and pollution abatement activities and mitigation to (i) address stormwater management, control, and water pollution prevention or abatement related to highway construction or due to highway runoff, including activities described in sections 133(b)(11), 328(a), and 329; or (ii) reduce vehicle-caused wildlife mortality or to restore and maintain connectivity among terrestrial or aquatic habitats.

*Id.* at 421 (emphasis added). MAP-21 also replaced the now-outmoded term "transportation enhancement activities" with "transportation alternatives" on the statutory list of projects that were eligible for federal assistance under title 23. *See id.* at 440-41. Again, there was no substantive change in the definition insofar as the activities of the Canal Authority were concerned.

Finally, in 2015, Congress made a significant changes to ISTEA, when it enacted the Fixing America's Surface Transportation Act (the "FAST Act"), Pub. L. No. 114-94, 129 Stat. 1312 (2015). In this revised statute, Congress removed "transportation alternatives" from the list of defined terms under 23 U.S.C. § 101(a). However, it redefined "eligible projects" (that is, projects eligible for federal assistance under § 133(b)) as follows:

> Eligible Projects. — Funds apportioned to a State under section 104(b)(2) for the surface transportation block grant program may be obligated for the following:
>
> . . .

> (15) Any type of project eligible under this section as in effect on the day before the date of enactment of the FAST Act, including projects described under section 101(a)(29) *as in effect on such day*.

FAST Act, §§ 1103(1), 1109(b), 129 Stat. 1312, 1328, 1338-40 (emphasis added). Obviously, the Thruway/Canal project was in effect on the day before the date the FAST Act was enacted, so the FAST Act expressly authorized the continued use of toll monies to fund the Canal System. Additionally, pursuant to 23 U.S.C. § 133(b)(15), projects involving "transportation alternatives" just prior to the passage of the FAST Act – including historic transportation facilities such as canals and their adjacencies – remained eligible for federal assistance and funding through toll revenues.

Plaintiffs argue that this perfectly clear statutory language is "vague" because "Congress' principal goal in enacting the portion of ISTEA cited by Defendants . . . is expressed in the first sentence" of ISTEA § 1012(e), which provides that "the Secretary shall allow for the continuance of tolls without repayment of Federal funds." (Pls.' Opp'n to Defs.' Mot. to Dismiss (Dkt. No. 109) at 13.) They argue that Congress' purpose was to relieve states of their preexisting obligation to repay federal funds that were used to maintain and repair toll roads, and that the following sentence operated only as a limitation on how excess funds could be used.

Unquestionably, one purpose – perhaps even the principal purpose – of the cited section was to absolve states from their obligation to repay federal highway assistance. And unquestionably the second sentence limits the ways in which the freed-up funds can be used by the states. But so what? The second sentence expressly authorizes the use of such funds for the "construction, reconstruction, restoration, repair, operation and maintenance" of "transportation enhancement activities" (later known as "transportation alternatives") – a term that includes the historic canals and their adjacencies. Assuming arguendo that Section 1012(e)'s principal purpose was indeed to relieve states of their repayment obligation, that does not undermine the force of the second sentence in any way. There is nothing at all vague about the language of ISTEA. Senator Moynihan saw to that.

Plaintiffs also argue that nothing in ISTEA specifically authorizes toll revenue expenditures of the magnitude that the Thruway Authority has spent over the past two decades to support the Canal System. (*See* Pls.' Opp'n at 13-14.) The short answer is that nothing in ISTEA caps the amount of excess toll revenue that can be used to support transportation enhancement activities. That may seem unfair to Plaintiffs, who are burdened with paying for facilities that they have no interest in using. But the purpose of obtaining congressional authorization was to get around the very unfairness of which Plaintiffs complain – the unfairness that would, in the absence of congressional authorization, violate the Dormant Commerce Clause.

So it would seem that Defendants had a complete defense to this lawsuit, which they failed to assert through three years of hard-fought litigation. They have asserted it now, in a post-partial summary judgment dispositive motion that rests on several different grounds.

Defendants principally argue that this Court lacks subject matter jurisdiction over the controversy. They argue that the belated discovery of congressional authorization for the practice here attacked renders Plaintiffs' federal constitutional claim "so insubstantial, implausible [or] . . . completely devoid of merit" as to deprive this Court of jurisdiction to hear it.

I well understand why the Thruway Authority hopes to convince the Court that it lacks subject matter jurisdiction; that defense is not waivable, so it does not matter that Defendants have failed to assert it for the past three and one half years.

However, I disagree that the existence of this meritorious defense deprives the Court of jurisdiction to adjudicate this case. Defendants are confusing lack of subject matter jurisdiction, Fed. R. Civ. P. 12(b)(1), with failure to state a claim on which relief may be granted, Fed. R. Civ. P. 12(b)(6). "Subject-matter jurisdiction . . . refers to a tribunal's 'power to hear a case,' a matter that 'can never be forfeited or waived.'" *Union Pac. R.R. Co. v. Bhd. of Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment, Cent. Region*, 558 U.S. 67, 81 (2009) (quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006)); *see also* Fed. R. Civ. P. 12(h)(3). But it is well settled that, "the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the courts' statutory or constitutional *power* to adjudicate the case." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998). Rather, "the failure to state a proper cause of action calls for a judgment on the merits," which can only be made after the Court assumes jurisdiction over the case. *Bell v. Hood*, 327 U.S. 678, 682 (1946). "Dismissal for lack of subject-matter jurisdiction because of the inadequacy of the federal claim is proper only when the claim is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy.'" *Steel Co.*, 523 U.S. at 89 (quoting *Oneida Indian Nation of N.Y. v. Cty. of Oneida*, 414 U.S. 661, 666 (1974)).

Plaintiffs' complaint alleges violations by Defendants of the Dormant Commerce Clause. Prior Supreme Court and Second Circuit cases have found violations of the Dormant Commerce Clause in strikingly similar situations, so Plaintiffs' claim is neither "insubstantial" nor so "devoid of merit as not to involve a federal controversy." Whether Congress did or did not authorize Defendants' use of Thruway tolls to subsidize the canals undoubtedly "involve[s] a federal controversy" – one that this Court would not have had the power to decide if it lacked the power to hear the case.

However, Plaintiffs cannot recover on their claim, because Congress authorized the challenged practice via ISTEA. In other words, the complaint fails to state a claim on which relief may be granted. By moving in the alternative for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), Defendants have formally – and finally – raised that argument. (*See* Dkt. No. 100; Defs.' Mem. of Law in Supp. of Defs.' Mot. to Dismiss (Dkt. No. 102) at 17.) The only question is whether they have waited too long to do so. The answer is no.

Plaintiffs argue that "congressional authorization is an affirmative defense within the meaning of Fed. R. Civ. P. 8(c), not an element of the plaintiff's claim. . . . As an affirmative defense, the congressional-authorization defense is 'untimely,' and therefore subject to waiver, if not pleaded in the defendant's answer." (Pls.' Opp'n at 3, 4.) Plaintiffs also argue that Defendants' invocation of Rule 12(c), Rule 54(b), and the Court's inherent power as alternative

bases under which to dismiss the complaint cannot "keep their congressional-authorization defense afloat." (*Id.* at 8.)

Plaintiffs are incorrect, for three reasons.

First, in their amended answer, Defendants did raise the defense of failure to state a claim on which relief could be granted. (Defs.' Am. Answer (Dkt. No. 78) ¶ 168 ("Plaintiffs fail to state a claim upon which relief can be granted.").) That preserves Defendants' ability to move for judgment on the pleadings, as they have here, on the ground pleaded – namely, that the complaint fails to state a viable claim for relief. Fed. R. Civ. P. 12(h)(2) provides that, "Failure to state a claim upon which relief can be granted . . . or to state a legal defense to a claim may be raised: (A) *in any pleading allowed or ordered under Rule 7(a);* (B) by a motion under Rule 12(c); or (C) at trial." (Emphasis added). Defendants' answer is a "pleading allowed or ordered under Rule 7(a)." It raised the defense of failure to state a claim.

But Plaintiffs argue that Defendants have waived their right to argue *the specific factual reason* why the complaint fails to state a claim by neither pleading it with factual specificity as an affirmative defense under Fed. R. Civ. P. 8(c) nor asserting it in a motion until after this Court had granted partial summary judgment to Plaintiffs.

Rule 8(c) states that "a party must affirmatively state any avoidance or affirmative defense, including" a number of specified grounds, ranging from duress to res judicata. The congressional authorization defense is not one of the affirmative defenses explicitly listed in Rule 8(c). And while the language of Rule 8(c) suggests that the list should not be read to be exhaustive, "There is no requirement under Rule 8(c) that a defendant plead *any* facts at all." *See Sibley v. Choice Hotels Int'l, Inc.*, 304 F.R.D. 125, 132-33 (E.D.N.Y. 2015) (emphasis added); *see also Tardif v. City of N.Y.*, 302 F.R.D. 32, 36 (S.D.N.Y. 2014). Here, the congressional authorization provided by ISTEA is the dispositive fact underlying Defendants' motion to dismiss for failure to state a claim, not an affirmative defense under Rule 8(c).

Plaintiffs may well be wrong when they contend that they do not have to prove absence of congressional authorization in order to state a claim for violation of the Dormant Commerce Clause. They argue that *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 90 (2d Cir. 2009) (emphasis added) sets out the only elements they must establish to make out a prima facie showing of liability on a Dormant Commerce Clause claim: "A state statute or regulation may violate the dormant Commerce Clause *only* if it (1) 'clearly discriminates against interstate commerce in favor of intrastate commerce,' (2) 'imposes a burden on interstate commerce incommensurate with the local benefits secured,' or (3) 'has the practical effect of 'extraterritorial' control of commerce occurring entirely outside the boundaries of the state in question." They urge that anything else must be shown by the Thruway Authority – and so pleaded as an affirmative defense – citing *Estate of Hamilton v. City of N.Y.*, 627 F.3d 50, 57 (2d Cir. 2010) and *Saks v. Franklin Covey Co.*, 316 F.3d 337, 350 (2d Cir. 2003), neither of which is a Dormant Commerce Clause case.

Defendants, however, correctly point out that "the Supreme Court has long read the [Commerce] Clause . . . to prohibit the states, *in the absence of specific congressional*

*authorization*, from regulating interstate commerce." *Incorporated Vill. of Rockville Ctr. v. Town of Hempstead*, 196 F.3d 395, 398 (2d Cir. 1999) (emphasis added). That being so, it is at least arguable that lack of congressional authorization is an element of Plaintiffs' claim – or at least a question they should have looked into before asserting what turns out to be a meritless claim for relief.

In the end, it does not much matter whether the burden to raise the issue of congressional authorization rests with Plaintiffs or Defendants. The panels in *Selevan* and *Rockville Centre* were not opining on the relationship between congressional authorization and the pleading requirements for a Dormant Commerce Clause claim; they do not speak directly to the arguments being made here. Whoever was responsible for raising the issue in the first place, Plaintiffs' claim is barred because Congress has barred it. This Court will not override Congress' express authorization for the challenged practice.[4]

Second, Plaintiffs' contention that it is too late for Defendants to move pursuant to Rule 12(c) – after the Court has considered the matter on the merits and granted a motion for partial summary judgment – is also lacking in merit.

There is no hard-and-fast time limit on a Rule 12(c) motion under Rule 12(h)(2). *See In re CCT Commc'ns, Inc.*, No. 07-10210, 2011 WL 5509197, at *2 (Bankr. S.D.N.Y. Nov. 10, 2011) ("[A]lthough the rule does not set a specific time limit for the motion, a Rule 12(c) motion must be made early enough so as not to delay the trial. . . . The determination whether the motion is a legitimate one or simply has been interposed to delay the trial is within the sound discretion of the judge.").

In *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 531 (S.D.N.Y. 2011), the Rule 12(c) motion was made at an even later stage in the case than in this one. After class certification, a full trial on the merits, and fourteen days of deliberation, the jury in *Vivendi* found that defendant Vivendi, a French company acting abroad, had committed 57 separate reckless violations of Section 10(b) of the Securities Exchange Act. *Id.* at 524. While post-trial motions were pending, the Supreme Court held, in *Morrison v. National Australia Bank*, 561 U.S. 247 (2010), that Section 10(b) does not apply extraterritorially. The court asked the parties in *Vivendi* to submit supplemental briefs addressing the impact of *Morrison* on the pending motions. The plaintiffs argued that Vivendi had waived the benefit of *Morrison* by failing to argue at an earlier stage of the litigation that the court lacked jurisdiction. But the district court held that Vivendi had not waived its right "to seek dismissal of the claims of American purchasers of ordinary shares" under Rule 12(h)(2) for failure to state a claim on which relief could be granted. *Id.* at 531. The court observed that, "While the language of Rule 12(h)(2) . . . does not expressly contemplate motions made after trial but before entry of judgment, the Court

---

[4] Even if congressional authorization were an affirmative defense that had to be specifically pleaded in Defendants' answer – which it is not -- the Court has discretion to construe the current motion as a motion for leave to amend Defendants' answer and to permit such an amendment. *Saks*, 316 F.3d at 351; *see also Monahan v. N.Y. Dep't of Corr.*, 214 F.3d 275, 284 (2d Cir. 2000) (holding that the district court has the discretion to treat an affirmative defense raised for the first time in a motion for summary judgment as a Rule 15(a) motion to amend the defendants' answer); *White Diamond Co. v. Castco, Inc.*, 436 F. Supp. 2d 615, 625 (S.D.N.Y. 2006).

concludes that under the circumstances here – in which judgment has yet to be entered and will not be entered for quite some time since the damages phase of this case has yet to occur – it is appropriate to permit Vivendi to bring a motion pursuant to Rule 12(h)(2)." *Id.* at 532.

The court went on to state, "While a number of cases have stated that motions to dismiss for failure to state a claim under Rule 12(h)(2) cannot be brought post-trial, . . . [n]one of these cases addressed a situation in which the party seeking dismissal for failure to state a claim had brought its motion after a trial on liability, but before judgment had been entered and before the damages phase of a case had begun." *Id.* at 532 n.18. Based on *Morrison*, the Court concluded that "claims brought by purchasers of Vivendi's ordinary shares must be dismissed" and accordingly amended the class definition in the case to exclude purchasers of ordinary shares. *Id.* at 533, 587.

This aspect of the *Vivendi* decision was affirmed on appeal. The Second Circuit concluded that "Vivendi did not forfeit its *Morrison* argument" by not bringing "its motion to dismiss the claims until after trial," and that "[t]he district court therefore appropriately determined that American purchasers of ordinary shares were not protected by § 10(b) under *Morrison*." *In re Vivendi Universal, S.A. Sec. Litig.*, 838 F.3d 223, 264 (2d Cir. 2016).

As in *Vivendi*, so in this case. The Court has granted Plaintiffs' motion for partial summary judgment, but we are far from done with the case. The parties have yet to resolve the very complicated issue of damages – indeed, no class has yet been certified – so the entry of final judgment is far in the future. It turns out that Plaintiffs' complaint really does fail to state a claim for relief: they cannot recover, because Congress expressly made legal the conduct here challenged as illegal. Nothing in Rule 12(c) or Rule 12(h)(2) precludes the making of a motion pursuant to those rules, even at this advanced (but far from terminal) point in the litigation. *See Valentine Props. Assocs., L.P. v. U.S. Dep't of Hous. & Urban Dev.*, 785 F. Supp. 2d 357, 370 (S.D.N.Y. 2011) ("Plaintiffs contend that Defendants waived their failure to state a claim arguments . . . by virtue of Defendants not presenting them in their prior Rule 12(b)(6) motion. However, it is permissible for Defendants to first raise such claims on a Rule 12(c) motion for judgment on the pleadings, as they have here." (citing Fed. R. Civ. P. 12(h)(2)(B))); *see also Gindi v. Silvershein*, Nos. 93 Civ. 8679, 93 Civ. 8680, 1995 WL 347397, at *1 n.1 (S.D.N.Y. June 8, 1995).

Third, there can be no finding of waiver here. Waiver is the conscious and voluntary relinquishment of a *known* right. *See Merrick v. UnitedHealth Grp. Inc.*, 175 F. Supp. 3d 110, 122 (S.D.N.Y. 2016) ("Waiver arises when a party has voluntarily or intentionally relinquished a known right." (internal quotation marks omitted)). The relinquishing person must be aware of what he is relinquishing.

There is no doubt in this Court's mind that neither the Attorney General nor anyone familiar with this lawsuit at the Thruway Authority actually knew about the fact that Congress deliberately carved out a Dormant Commerce Clause exception for the Thruway Authority's acquisition and maintenance of the canals, so that the State of New York would not run afoul of the Constitution. Counsel for Defendants have fallen on their swords; they admit that they were unaware of the member item in ISTEA that exempted the Thruway/canal arrangement from the

reach of the Dormant Commerce Clause. (*See* Defs.' Mem. of Law at 3 ("[I]t is regrettable and unfortunate that counsel to the Authority did not identify until now the 1991 congressional authorization for the use of Thruway toll revenues to maintain the Canals . . . .").) Plaintiffs, too, appear to have been unaware that Congress authorized the use of excess Thruway toll revenues for the canals – although, ironically, the ATA actually testified on the proposed legislation (though not, apparently, on the Moynihan member item) back in 1991, when the law was originally introduced.[5] With the benefit of hindsight, the fact that no one sued to protest funding the canals with Thruway toll monies until twenty years after the practice began was a clue, one that should have caused all of us to go looking for some reason why that was so – a reason that could only be found in express congressional authorization for the practice. But two decades had passed, and institutional memories had obviously faded, at both the ATA and the Thruway Authority.

Plaintiffs are of course correct that "ISTEA is . . . the law of the land, published in the U.S. Code since the administration of George H.W. Bush." (Pls.' Opp'n at 5.) We all know that ignorance of the law is no excuse for violating the law. And there is no question that someone at the Thruway Authority *should have known* about any and every matter that impacted the legality of its business activity. But "should have known" does not suffice for waiver, which requires conscious relinquishment of a right that is *actually known*. A party cannot relinquish what it does not know. *See Holzsager v. Valley Hosp.*, 646 F.2d 792, 796 (2d Cir. 1981) ("In any event a party cannot be deemed to have waived objections or defenses which were not known to be available at the time they could first have been made, especially when it does raise the objections as soon as their cognizability is made apparent.").

It is indeed unfortunate that no one at the Attorney General's Office or the Thruway Authority thought to explore the historical records until after the Court's decision on the constitutional issue imminently exposed the State to massive damages claims, from Plaintiffs and others.[6] By that time, the taxpayers of the State of New York had paid for thousands of hours of unnecessary legal work; Plaintiffs had made a massive investment of time and money in order to pursue their Dormant Commerce Clause claim; and this Court had expended hundreds of hours wading through masses of briefs, records, and reports – all in order to decide an issue that could have been speedily dispatched. No one regrets that waste of time and money more than I do. But it does not change the fact that Plaintiffs' claims must be dismissed, because Congress decided, with great specificity, to exempt the New York State Thruway Authority's expenditure of excess toll revenues on the New York State Canal System from the reach of the Dormant Commerce Clause.

---

[5] "ATA entered an appearance on March 28, 1991 at the ISTEA Field Hearings and submitted a detailed statement of its position regarding the proposed legislation." (Defs.' Reply Mem. of Law in Supp. of Defs.' Mot. to Dismiss (Dkt. No. 113) at 9.) In a statement dated April 11, 1991, Gerald J. McKiernan, Vice President of Legislative Affairs for ATA, noted that "states should have more flexibility in how their federal transportation dollars are spent. . . . They know their highways best, they know their own economic needs best – let them decide." (*See* Dkt. No. 113-1 at 7.)

[6] A related lawsuit brought by the American Bus Association was filed on February 1, 2017, seeking the same relief as in the instant action. *See Am. Bus Ass'n et al. v. N.Y. State Thruway Auth.*, 17-cv-782. An order to show cause why Plaintiffs' complaint in that case should not be dismissed along with this case is issuing today.

So . . . never mind.

Defendants' motion to dismiss is GRANTED. The Court's order dated August 10, 2016, granting Plaintiffs' motion for partial summary judgment and denying Defendants' cross-motion for summary judgment (Dkt. No. 68) is hereby vacated, and Plaintiffs' complaint is DISMISSED WITH PREJUDICE. The outstanding motion for class certification is DENIED AS MOOT.

The Clerk of the Court is directed to remove Dkt. Nos. 74 and 100 from the Court's list of pending motions, to enter judgment for Defendants, and to close the file.

Dated: February 28, 2017

Chief Judge

BY ECF TO ALL COUNSEL